# In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

No. 02-2587

JAMES D. MINCH, RICHARD A. GRAF, and
RICHARD COSENTINO,

*Plaintiffs-Appellees*,

v.

CITY OF CHICAGO,

*Defendant-Appellant.*

—————————

No. 02-2588

DONALD DRNEK,

*Plaintiff-Appellee,*

v.

CITY OF CHICAGO,

*Defendant-Appellant.*

—————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 01 C 0840 & 01 C 2586—**Elaine E. Bucklo**, *Judge.*

—————————

ARGUED FEBRUARY 28, 2003—DECIDED April 9, 2004

—————————

Before POSNER, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.*     In 1996, Congress restored to the Age Discrimination in Employment Act ("ADEA") an exemption permitting state and local governments to place age restrictions on the employment of police officers and firefighters. *See* 29 U.S.C. § 623(j) (1994 & Supp V 1999). Four years later, the Chicago City Council exercised its authority under this exemption to reestablish a mandatory retirement age of 63 for certain of the City's police and fire-fighting personnel. Police officers and firefighters who were subject to the age restriction filed two suits asserting in relevant part that the reinstated mandatory retirement program amounted to subterfuge to evade the purposes of the ADEA. *See* § 623(j)(2). Although the text of the City's ordinance indicated that the City was reestablishing a mandatory retirement age in furtherance of public safety, the plaintiffs asserted that in truth the City, as evidenced by the remarks of certain City Council members and City officials, acted out of bias against older workers and a de-sire to open positions on its police and firefighting forces for younger and more diverse individuals. The City moved to dismiss the complaints, contending that the plaintiffs had failed to state a claim of age discrimination on which the court could grant relief. The district court denied the motion, reasoning that if the plaintiffs could prove that the City reinstated a mandatory retirement age for discrimi-natory reasons, the mandatory retirement program would amount to a subterfuge to evade the purposes of the ADEA. *Drnek v. City of Chicago*, 192 F. Supp. 2d 835 (N.D. Ill. 2002) ("*Drnek I*"). The court subsequently certified for interlocutory appeal the question of whether there is any evidence through which a plaintiff might prove that a mandatory retirement program, so long as it satisfies the other criteria specified by the statutory exemption, *see* § 623(j)(1), constitutes a subterfuge to evade the purposes of the ADEA. *Drnek v. City of Chicago*, 205 F. Supp. 2d 894, 900 (N.D. Ill. 2002) ("*Drnek II*"). Although we answer that question in the affirmative, we conclude that the particular

theory of subterfuge that the plaintiffs pursue in this case is not viable. We accordingly remand with directions to dismiss their ADEA claims.

## I.

Historically, Chicago, like many other state and local governments, has placed age limits on the employment of its police and firefighting personnel. As early as 1939, for example, Chicago's municipal code required city firefighters to retire at the age of 63.

As it was originally enacted in 1967, the ADEA by its terms did not apply to the employees of state and local governments. Congress amended the statute to include those employees in 1974. P.L. 93-259 § 28(a)(2), 88 Stat. 55, 74 (April 8, 1974). However, in view of the Tenth Amendment jurisprudence of the day, *see National League of Cities v. Usery*, 426 U.S. 833, 96 S. Ct. 2465 (1976), *overruled by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S. Ct. 1005 (1985), the constitutional validity of the amendment remained in doubt until 1983, when the Supreme Court held in *E.E.O.C. v. Wyoming*, 460 U.S. 226, 103 S. Ct. 1054 (1983), that the Tenth Amendment posed no obstacle to banning age discrimination by state and local governments.[1] State and local rules establishing maximum

---

[1] More recently, of course, the Supreme Court has held that Congress exceeded its authority under the enforcement clause of the Fourteenth Amendment when it purported to abrogate the States' Eleventh Amendment immunity from suit by private individuals under the ADEA. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S. Ct. 631 (2000). That holding does not affect the plaintiffs' suits against the City, however, as the Eleventh Amendment does not apply to municipalities. *See Lake Country*

(continued...)

hiring and retirement ages for police officers and firefighters were now vulnerable to challenge; only if it could be shown that age was a bona fide occupational qualification for these positions would the rules survive scrutiny under the ADEA. *See Kopec v. City of Elmhurst*, 193 F.3d 894, 897 (7th Cir. 1999). The Equal Employment Opportunity Commission ("E.E.O.C.") began to challenge these age limits as discriminatory. Chicago, seeing the handwriting on the wall, raised the mandatory retirement age for its firefighters and police officers to 70, the maximum age at which employees enjoyed the protection of the ADEA at that time.[2]

Responding to the concerns expressed by state and local governments, Congress in 1986 amended the ADEA to exempt the mandatory retirement of state and local police and firefighting personnel from the statute's coverage. P.L. 99-592 §§ 3, 4, 100 Stat. 3342, 3342-43 (Oct. 31, 1986). As we noted in *Kopec*, Congress enacted the exemption in recognition that there was, as of that time, no consensus as to the propriety of age limits on employees working in the realm of public safety. 193 F.3d at 903-04. The exemption thus permitted any state or local government which, as of March 3, 1983 (the day after the Supreme Court decided *E.E.O.C. v. Wyoming*), had in place age restrictions on the employment of police officers and firefighters, to restore

---

(...continued)

*Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 & n.19, 99 S. Ct. 1171, 1177 & n.19 (1979); *Nelson v. LaCrosse County Dist. Atty.*, 301 F.3d 820, 827 n.7 (7th Cir. 2002); *Richman v. Sheehan*, 270 F.3d 430, 439 (7th Cir. 2001).

[2] Congress later amended the ADEA to remove age 70 as the maximum age at which the statute applied. *See* P.L. 99-592 § 2(c)(1), 100 Stat. 3342, 3342 (Oct. 31, 1986).

those restrictions.[3] In 1988, Chicago took advantage of the exemption and reinstated a mandatory retirement age of 63 for its firefighters and police officers.

Pursuant to a sunset provision in the 1986 legislation, the exemption permitting the reinstatement of these age limits expired at the end of 1993. P.L. 99-592 § 3(b), 100 Stat. 3342, 3342. In the ensuing years, Chicago, along with other state and local governments, were again compelled to drop their age restrictions on the employment of police and firefighting personnel.

---

[3] The exemption provided that "[i]t shall not be unlawful for an employer which is a State, a political subdivision of a State, an agency or instrumentality of a State or a political subdivision of a State, or an interstate agency to fail or refuse to hire or to discharge any individual because of such individual's age if such action is taken:

(1) with respect to the employment of an individual as a firefighter or as a law enforcement officer and the individual has attained the age of hiring or retirement in effect under applicable State or local law on March 3, 1983, and

(2) pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter.

29 U.S.C. § 623(j) (1988).

The 1986 legislation also called upon the United States Secretary of Labor and the E.E.O.C. to study the feasibility of examining police and firefighting personnel for physical and mental fitness as an alternative to age limitations on their employment. P.L. 99-592 § 5, 100 Stat. 3342, 3343. The legislation further directed the E.E.O.C. to propose guidelines for the administration of such physical and mental assessments. *Id.* Although a feasibility study was completed, no guidelines for the administration of fitness testing for such workers were ever proposed. *See Kopec*, 193 F.3d at 897 n.1.

In 1996, however, Congress reinstated the exemption, this time without any sunset provision, and retroactively to the date that the prior exemption had expired in 1993. P.L. 104-208 §§ 119(1)(b), 119(3)(b), 110 Stat. 3009, 3009-23 - 3009-25 (Sept. 30, 1996); *see Kopec*, 193 F.3d at 898. The 1996 legislation also broadened the exemption, allowing cities and states which had not imposed age restrictions on their police and firefighters prior to the *Wyoming* decision to enact such limits. As relevant here, the exemption, codified at 29 U.S.C. § 623(j),[4] permits a public

---

[4] The 1996 exemption provides as follows:

> **(j) Employment as firefighter or law enforcement officer.**
>
> It shall not be unlawful for an employer which is a State, a political subdivision of a State, an agency or instrumentality of a State or a political subdivision of a State, or an interstate agency to fail or refuse to hire or to discharge any individual because of such individual's age if such action is taken—
>
> (1) with respect to the employment of an individual as a firefighter or as a law enforcement officer, the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained—
>
> (A) the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or
>
> (B) (i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after September 30, 1996; or
>
> (ii) if applicable State or local law was enacted after September 30, 1996, and the individual was discharged, the higher of—

(continued...)

<div style="border-top: 1px solid black; width: 40%;"></div>

(...continued)

          **(I)**   the age of retirement in effect on the date of such discharge under such law; and

          **(II)**  age 55; and

   **(2)**  pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter.

29 U.S.C. § 623(j) (1994 & Supp. V. 1999).

In the 1996 legislation, Congress also directed the Secretary of Health and Human Services to study and report to Congress within three years on the feasibility of testing the ability of police and firefighters to complete public safety tasks. Within four years, the Secretary was to issue advisory guidelines for the use and administration of tests designed to gauge the mental and physical competence of police and firefighting personnel. After those guidelines were issued, the Secretary was further directed to issue regulations identifying appropriate tests that a state or local government could use to evaluate the fitness of police officers and firefighters who had reached the mandatory retirement age specified by that government. Once those regulations were in place, state and local governments would be compelled to give their public safety personnel the opportunity to demonstrate their continued fitness for duty once they reached retirement age. P.L. 104-208 § 119(2), 110 Stat. at 3009-24 - 3009-25; *see Kopec*, 193 F.3d at 898 n.2. To date, however, no such guidelines or regulations have been issued.

The failure to promulgate guidelines and regulations for fitness testing gives rise to an ambiguity in the statute. Section 623(j)(1) purports to condition applicability of the exemption on the state or local government's compliance with section (3)(d)(2) of the 1996 amendment. This is an apparent reference to the fitness guidelines and regulations that the Secretary of Health and Human Services was directed to promulgate. *See Drnek I,* 192 F. Supp. 2d at 838-39. As no such guidelines and regulations have yet been issued, state and local governments obviously cannot comply with them. Consequently, this component

(continued...)

employer to discharge a police officer or firefighter based on his age, subject to two principal conditions. First, section 623(j)(1) specifies that the employee must have attained either the age of retirement that the state or municipality had in place as of March 3, 1983 or, if the age limit was enacted after the date the 1996 exemption took effect, the higher of the retirement age specified in the post-1996 enactment or the age of 55. Second, section 623(j)(2) requires that the state or city discharge such an employee pursuant to a bona fide retirement plan that is not a subterfuge to evade the purposes of the statute.

Four years later, the Chicago City Council adopted a mandatory retirement ordinance ("MRO") reinstating a mandatory retirement age of 63 for its police officers and for its uniformed firefighting fire personnel.[5] In the pre-

---

(...continued)

of section 623(j)(1) is essentially meaningless at this juncture. As the district court summarized, "The provision in § 623(j)(1) for compliance with § 3(d)(2) merely imposed an obligation on employers to provide [fitness] tests when and if suitable tests became available; it did not make tests a condition precedent to the operation of the exception. Because HHS has not promulgated the regulations called for by the statute, the City could not violate § 623(j)(1) by failing to provide fitness tests before enforcing the [Mandatory Retirement] Ordinance." *Id.* at 842.

[5] In relevant part, the City's Municipal Code, as amended by the MRO, reads:

    (a) Effective December 31, 2000, the age of 63 shall be the maximum age for employment of sworn members of the police department, including a sworn member who is transferred or appointed to a supervisory or administrative position.

    (b) Effective December 31, 2000, the age of 63 shall be the maximum age for employment of any member of the uniformed service of the fire department, the duties of whose

(continued...)

amble to that ordinance, the City Council indicated that its purpose in restoring the retirement age was to protect the safety of Chicago residents.[6]

---

(...continued)

> position are primarily to perform work directly connected with the control and extinguishment of fires or the maintenance and use of firefighting apparatus and equipment, including an employee engaged in this activity who is transferred or appointed to a supervisory or administrative position. . . .

> * * *

> (d) All persons to whom this ordinance applies shall be retired upon attainment of age 63. Any person to whom this ordinance applies whose age is 63 or more on December 31, 2000 shall be retired upon that date.

> ***

Municipal Code of Chicago § 2-152-410 (Lexis Nexis 2001).

[6] The preamble to the MRO stated:

> WHEREAS, The Safety of the citizens of the City of Chicago is of the utmost concern to the City Council of the City of Chicago; and

> WHEREAS, The citizens of the City of Chicago deserve the most effective police and fire protection possible;

> WHEREAS, The City Council finds that these goals are served by returning to the mandatory retirement age of sixty-three which had historically applied to sworn police and uniformed firefighters; and

> WHEREAS, Both the Illinois Legislature and United States Congress have recognized the necessity of allowing municipalities to institute mandatory retirement for police and fire personnel;

> . . . .

Journal of Proceedings in the Chicago City Council Journal, May 17, 2000, 32900-32901.

The four plaintiffs were Chicago police officers and uniformed firefighters who were 63 or greater when the MRO took effect and thus were forced to take immediate retirement. They filed two actions against the City asserting, in relevant part, that the City was not actually motivated by public safety purposes in enacting the MRO. The cases were consolidated in the district court. Although the plaintiffs do not dispute at this juncture that the MRO and their involuntary retirement pursuant to the MRO satisfy the criteria set forth in section 623(j)(1), they allege that the MRO amounts to a subterfuge to evade the purposes of the ADEA and for that reason amounts to illegal age discrimination. Among other motives for enacting the MRO, the plaintiffs assert, the City wanted to get rid of what one city council member described as "old-timers" and "deadbeats" in the police and fire departments and to make room in those departments for younger, more racially and ethnically diverse individuals who would work harder and bring "fresh" ideas with them. This amounts to age discrimination in violation of the ADEA, in the plaintiffs' view.

The district court denied the City's motion to dismiss the plaintiffs' ADEA claims. *Drnek I*, 192 F. Supp. 2d at 843-46. In the court's view, the question of whether the city reinstated a mandatory retirement age of 63 as a subterfuge for age discrimination was one of fact that necessitated inquiry beyond the statement of purpose set forth in the preamble to the MRO into the true motive or motives behind the legislation. *Id.* at 844-45. "Age-based retirement is tolerated in limited circumstances under § 623(j), but not for the wrong reasons, *i.e.* not for reasons that are merely a cover-up for the type of ageism prohibited by the ADEA." *Id.* at 845. Here, the plaintiffs were able to point to the remarks of the sponsor of the MRO and of high-ranking city officials as proof that the City may have been motivated impermissibly by stereotypes and bias against older members of the police and fire departments when it enacted

the MRO. The plaintiffs also represented that the City had delayed reinstating the retirement age of 63 until after a close friend of the Mayor (who otherwise would have been forced to retire) voluntarily retired at age 68. The district court found these allegations, suggesting that the City did not actually enact the MRO for legitimate, safety-related reasons, sufficient to state a viable claim for subterfuge. *Id.* at 843-46.

On reconsideration, the court distinguished *Bell v. Purdue Univ.*, 975 F.2d 422 (7th Cir. 1992), in which this court had rejected a claim of subterfuge notwithstanding evidence of an employer's animus toward older employees. *Bell* dealt with an employer's practice of ceasing pension fund contributions on behalf of an employee once he or she reached the age of 65. The relevant version of the ADEA contained an exception permitting age-based decisions in employee benefit programs so long as they were not a subterfuge to evade the purposes of the statute. *See* 29 U.S.C. § 623(f)(2) (1982). Looking to the Supreme Court's decision in *Public Employees Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 109 S. Ct. 2854 (1989), we concluded that an age-based differential in fringe benefits would not amount to a subterfuge unless the employer used that differential to camouflage age discrimination in some distinct aspect of the employment relationship—i.e., other than with respect to fringe benefits. *Bell*, 975 F.2d at 430. The City argued that here, as in *Bell*, there was no case to be made that it had taken advantage of a statutory exemption that expressly allowed mandatory retirement in order to commit some other type of age-based discrimination forbidden by the statute.

The district court acknowledged that "[t]here is some consistency between the City's interpretation here and the *Betts/Bell* interpretation." *Drnek II*, 205 F. Supp. 2d at 898. However, the court was concerned that applying the *Betts/Bell* approach in the context of mandatory retirement

would render the subterfuge provision of section 623(j)(2) "if not dead, at least moribund." *Id.* Whereas the exception at issue in *Betts* and *Bell* concerned only fringe benefits, leaving all other aspects of the employment relationship protected by the ADEA's ban on arbitrary age discrimination, section 623(j) permits an employer to terminate a worker's employment altogether, leaving nothing in the employment relationship for the statute to protect. *Id.* Thus, a view of subterfuge that required the plaintiff to show that mandatory retirement is being used as a cover for some type of age discrimination other than age-based discharge would render the "not a subterfuge" language of section 623(j)(2) "utterly meaningless." *Id.* at 899. The court therefore declined to apply *Bell*'s rationale to this case. It remained convinced that if the City had reinstated mandatory retirement with the aim of clearing older employees from the ranks of firefighters and police officers in order to make room for younger workers, as the plaintiffs alleged, that discriminatory purpose in and of itself would establish a subterfuge within the meaning of section 623(j)(2). *Id.*

Recognizing that there was room for disagreement on the issue, however, the court granted the City's request to certify a question for interlocutory review. *See* 28 U.S.C. § 1292(b). The City had asked the court to certify the question "whether allegedly illicit motives on the part of individual legislators and municipal officials for enacting a retirement plan that mandatorily retires police and fire personnel at age 63 and results in their replacement with younger workers can demonstrate subterfuge under section 623(j) of the ADEA." The court rejected this as an appropriate question, "because it is too early in the lawsuit to determine that this is the *only* type of evidence of subterfuge that the plaintiffs could discover." *Drnek II*, 205 F. Supp. 2d at 899 (emphasis in original). At the same time, the court was forced to wonder what proof might suffice to establish subterfuge. If, as the City contended, evidence of

impure motives for enacting the MRO did not suffice, and if, as the court believed, it was essentially impossible for a plaintiff to establish the type of subterfuge envisioned by *Betts* and *Bell*, then as a practical matter, there was no way to show that a mandatory retirement program constituted a subterfuge to evade the purposes of the ADEA. In effect, so long as a mandatory retirement program satisfied the basic eligibility criteria set forth in section 623(j)(1), the program would be immune from challenge as a subterfuge. *See id.* at 898-99. The court thus opted to certify a broader question than the City had proposed, asking "whether a plaintiff can demonstrate subterfuge under § 623(j)(2) with *any* kind of evidence if there is no violation of § 623(j)(1)." *Id.* at 900 (emphasis in original).

## II.

This appeal calls upon us to consider under what circumstances a mandatory retirement program for public safety personnel might constitute a subterfuge to evade the purposes of the ADEA. The question certified by the district court asks whether there is any evidence with which a plaintiff can demonstrate subterfuge under section 623(j)(2) if there is no violation of section 623(j)(1). We agree with the district court that subterfuge can be shown even if the requirements of subsection (j)(1) are satisfied. A plaintiff can establish subterfuge if he or she can demonstrate that a state or local government took advantage of the exemption and imposed a mandatory retirement age for police and firefighting personnel in order to evade a different substantive provision of the statute. However, because the ADEA expressly permits employers like Chicago to reinstate mandatory retirement programs for police and fire personnel and thus to discharge employees based on their age, proof that local officials exercised this right for impure motives will not in and of itself suffice to establish subter-

fuge for purposes of section 623(j)(2). Given that the plaintiffs' theory of subterfuge in these cases relies solely on proof that Chicago City Council members and other City officials may have harbored discriminatory attitudes about older workers when they reinstated a mandatory retirement age of 63 for police officers and firefighters and that they adopted the MRO for illicit motives unrelated to public safety, the plaintiffs have failed to state an ADEA claim on which relief may be granted.

The ADEA itself does not specify what constitutes a "subterfuge to evade the purposes" of the statute, and the Supreme Court has not specifically addressed that question within the confines of section 623(j)(2). However, the Supreme Court's decision in *Betts* and our own decision in *Bell* have considered the meaning of "subterfuge" for purposes of a similar provision of the ADEA, since revised. The language of section 623(j)(2) appears to have been modeled after (and is virtually identical to) the language construed in *Betts* and *Bell*, *see Knight v. Georgia*, 992 F.2d 1541, 1545 (11th Cir. 1993), and so we look to those cases for guidance as to what might constitute a subterfuge for purposes of section 623(j)(2). *See Trans World Airlines v. Thurston, Inc.*, 469 U.S. 111, 121, 105 S. Ct. 613, 621 (1985); *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756, 99 S. Ct. 2066, 2071 (1979).

At issue in *Betts* was the validity of an age-based disability retirement program for state and local government employees in Ohio. Under the terms of that program, an employee who became permanently disabled before the age of 60 was eligible for disability retirement benefits, which amounted to a minimum of 30 percent of her final average salary. Employees who became disabled after the age of 60, however, were eligible only for standard retirement benefits based on their age and years of service. No floor applied to those benefits, so that an employee who became disabled after the age of 60 could (depending on her age and

length of service) receive retirement benefits amounting to substantially less than 30 percent of her final average salary. The plaintiff in *Betts* had a medical condition that forced her to retire at age 61, and her monthly benefits under the standard retirement program were about half what they would have been had she been eligible for the age-restricted disability retirement benefits. She filed suit contending that the age ceiling of 60 that the program placed on disability retirement benefits violated the ADEA's ban on age discrimination.

At the time that *Betts* was decided, the ADEA contained a provision exempting from the statute's ban on age discrimination any bona fide employee benefit plan, including a retirement and pension plan, so long as the plan was not a subterfuge to evade the purposes of the statute. 29 U.S.C. § 623(f)(2) (1982). The parties in *Betts* conceded that the disability retirement plan at issue was bona fide, and as the Supreme Court noted, that plan fell squarely within the exemption. 492 U.S. at 166, 109 S. Ct. at 2860-61. Thus, only if the plan amounted to a subterfuge to evade the purposes of the statute would it be illegal. Interpretive regulations issued by the Department of Labor and the E.E.O.C. indicated that fringe benefit programs awarding different levels of benefits based on age were not a subterfuge so long as the age distinctions were cost-justified. Relying in part on those regulations, the lower courts had concluded that Ohio's disability retirement program amounted to a subterfuge to evade the purposes of the ADEA because the state could point to no cost justification or other substantial business purpose for restricting eligibility to persons who became disabled before reaching the age of 60. *Betts v. Hamilton County Bd. of Mental Health Retardation*, 631 F. Supp. 1198 (S.D. Ohio 1986), *aff'd*, 848 F.2d 692 (6th Cir. 1988). The Supreme Court reversed.

At the outset of its analysis, the Supreme Court rejected the notion, reflected in the interpretative regulations, that an age-based distinction in employee benefits could only survive scrutiny under the ADEA if the employer were able to establish a cost justification for the distinction— i.e., that providing the benefit to older workers would burden the employer with added costs. In the court's view, such a requirement could not be squared with the plain language of the statutory exemption for fringe benefit plans, which said nothing about such a justification. 492 U.S. at 169-172, 109 S. Ct. at 2862-64. Although the plaintiff pointed to support in the legislative history for the notion that the exemption should be limited to age-based distinctions that were cost-justified, the Court saw no need to resort to legislative history, as the statutory language was clear: line-drawing based on age was permitted in a fringe benefit program so long as the program did not constitute a subterfuge to evade the purposes of the statute. *See id.* at 172, 109 S. Ct. at 2864.

The term, "subterfuge," in the Court's view, should be given its ordinary meaning, *id.* at 168, 109 S. Ct. at 2862, i.e., "a scheme, plan, stratagem, or artifice of evasion," *id.* at 167, 171, 109 S. Ct. at 2861, 2863 (quoting *United Air Lines, Inc. v. McCann*, 434 U.S. 192, 203, 98 S. Ct. 444, 450 (1977)). The Court observed that the purposes of the ADEA include promoting the employment of older persons based on ability rather than age, prohibiting arbitrary age discrimination in employment, and helping employers and workers ascertain means of addressing difficulties arising from the impact of age upon employment. *Id.* at 175-76, 109 S. Ct. at 2866 (quoting 29 U.S.C. § 621(b)). The only one of these purposes that the retirement plan at issue could be a subterfuge to evade would be the elimination of arbitrary age discrimination in employment. *Id.* at 176, 109 S. Ct. at 2866. But not all age discrimination is arbitrary, the Court pointed out, for the ADEA itself sets out various exemptions

from and affirmative defenses to its coverage. *Ibid.* In order to determine whether a particular practice is arbitrary, and therefore contrary to the purposes of the ADEA, one must look for guidance to the substantive provisions of the statute, which "provide the best evidence of the nature of the evils Congress sought to eradicate." *Ibid.* The statute does prohibit age-based discrimination in compensation and the other terms, conditions or privileges of employment, *see* 29 U.S.C. § 623(a)(1), and that provision could be construed to reach employee benefit plans. *Id.* at 176-77, 109 S. Ct. at 2866. One thus could say that any retirement or other employee benefit plan restricting eligibility based on age constitutes a form of age discrimination in the terms and conditions of employment and to that extent amounts to a subterfuge to evade the statutory purpose of prohibiting such arbitrary discrimination. *Id.* at 177, 109 S. Ct. at 2866. But that view obviously would render the statutory exemption for benefit programs "nugatory." *Ibid.* On the other hand, one could read the exemption and its "not a subterfuge" criterion to permit age-based line drawing in a fringe benefit program such as a disability retirement plan, so long as the plan does not discriminate "in other, non-fringe benefit aspects of the employment relationship." *Id.* at 177, 109 S. Ct. at 2866. This alternate construction, the Court reasoned, would give effect both to the broad ban on arbitrary age discrimination in employment and to the exemption for bona fide employee benefit plans. *Id.* at 177, 180, 109 S. Ct. at 2866-67, 2868.

The Court postulated two scenarios in which an employee benefit plan might be considered an effort to evade the purposes of the ADEA. In the first scenario, an employer implements a provision in a benefit plan that has the effect of penalizing an employee who has spoken out against practices made unlawful by the ADEA. In that instance, the plan could be viewed as a means of retaliating against the employee for asserting his statutory rights, something

which is forbidden by the anti-retaliation provision of the statute. *Id.* at 180, 109 S. Ct. at 2868; *see* 29 U.S.C. § 623(d). In the second scenario, the employer reduces the salaries of all workers while substantially increasing fringe benefits for younger workers. There too, the terms of the fringe benefit plan could be viewed as an effort to accomplish something that the statute expressly forbids—paying younger workers higher wages than older workers, based solely on age. *Ibid.*; *see* 29 U.S.C. § 623(a)(1). These examples sufficed to demonstrate that the subterfuge provision, construed as the Court thought it should be, provided "not-insignificant protections" to older workers while at the same time preserving a safe harbor for bona fide employee benefit plans. *Ibid.*

The Court therefore sustained Ohio's age-based disability retirement plan notwithstanding the lack of proof that the age cutoff of 60 was justified by cost considerations. The statutory scheme placed the burden on the plaintiff to establish subterfuge, the Court observed:

> [The subterfuge prong of the exemption] is not so much a defense to a charge of age discrimination as it is a description of the type of employer conduct that is prohibited in the employee benefit plan context. By requiring a showing of actual intent to discriminate in those aspects of the employment relationship protected by the provisions of the ADEA, [the subterfuge prong] redefines the elements of a plaintiff's prima facie case instead of establishing a defense to what would otherwise be a violation of the Act. Thus, when an employee seeks to challenge a benefit plan as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some non-fringe benefit aspect of the employment relation.

*Id.* at 181, 109 S. Ct. at 2868. The plaintiff in *Betts* had not shown that the retirement disability plan was a vehicle for discrimination in some aspect of employment relationship other than fringe benefits, and so she had not proven that it was a subterfuge to evade the purposes of the ADEA. *Id.* at 182, 109 S. Ct. at 2869.

In *Bell v. Purdue Univ.*, *supra*, this court considered whether a university's practice of discontinuing contributions to pension plans for employees once they reached age 65 might constitute a subterfuge.[7] Employees filed suit contending that the practice amounted to age discrimination. The university defended the practice based on the same statutory provision at issue in *Betts*, exempting a bona fide fringe benefit plan from the statutory ban on age discrimination so long as it was not a subterfuge to evade the purposes of the ADEA. This court found *Betts* controlling, and, accordingly, it looked for proof that the university's practice of cutting off pension fund contributions at age 65 reflected an effort to discriminate in other aspects of the employment relationship. 975 F.2d at 425-26, 428-29. We found no evidence to support such a finding.

Although the plaintiffs in *Bell* highlighted "statements and anecdotal evidence that some officials at Purdue preferred younger faculty," *id.* at 429, we found this evidence insufficient to support the claim of subterfuge. Arguably the evidence spoke to the university's motives for cutting off pension contributions for older employees—the plaintiffs held it up as proof that the cutoff was adopted as a way to

---

[7] An amendment to the ADEA which took effect after the plaintiffs filed suit required an employer to continue contributing to a pension fund on an employee's behalf until the employee actually retired. P.L. 99-509 § 9201, 100 Stat. 1973, 1973-74 (Oct. 21, 1986); *see Bell*, 975 F.2d at 423. *Bell* thus addressed the legality of the university's practice with respect to pension fund contributions prior to the effective date of the amendment. *Id.*

discourage faculty members from staying on past the age of 65. But we made clear that "the defendants cannot be liable for their motives if their conduct has not evaded the ADEA's prohibitions." *Id.* And the plaintiffs could point to nothing suggesting that the university was using the contribution cutoff as a way to alter the wages of older employees, or alternatively to force their retirement or otherwise diminish their employment prospects. *Id.* at 429-30. "The plaintiffs . . . have offered no evidence that the fringe benefit cut in this case is anything more than meets the eye—an age differential in fringe benefits which is permitted under the ADEA." *Id.*

Here, the plaintiffs urge us to disregard the approach to subterfuge set out in *Betts* and followed by this court in *Bell.* The Older Workers Benefit Protection Act, P.L. 101-433 § 101, 104 Stat. 978 (Oct. 16, 1990) ("OWBPA"), over-ruled the result in *Betts*, amending the ADEA so as to prohibit employers from disfavoring older workers in employee benefit programs except as justified by cost considerations. *See Bell*, 975 F.2d at 424 n.2. For that reason, the plaintiffs insist that the *Betts* approach to subterfuge is no longer valid. We disagree.

Although Congress overruled the result of *Betts*, the manner in which it did so is telling. Rather than supplying its own definition of what constitutes a subterfuge to evade the purposes of the ADEA, Congress elected to remove the "not a subterfuge" language altogether from the exemption for benefit programs. *See* P.L. 101-433 § 103, 104 Stat. 978, 978-89. That course suggests that Congress, although displeased with the result in *Betts*, was not attempting to supplant the Court's approach to subterfuge. *See Modderno v. King*, 82 F.3d 1059, 1060-61 (D.C. Cir. 1996); *Knight*, 992 F.2d at 1546.

*Betts* itself made this same point. The Court in *Betts* looked to its prior decision in *United Air Lines, Inc. v.*

*McCann*, 434 U.S. 192, 98 S. Ct. 444 (1977), for guidance as to what might constitute a subterfuge. *McCann* had concluded that a retirement plan compelling employees to stop working at the age of 60 could not constitute a subterfuge to evade the purposes of the ADEA when the plan had been adopted more than 25 years before the statute was enacted. *Id.* at 203, 98 S. Ct. at 450. In the interim between *McCann* and *Betts*, Congress had overruled the result in *McCann* by adding language to the statutory exemption for benefit plans stating that no such plan shall require or permit the involuntary retirement of any individual based on his or her age. P.L. 95-256 § 2(a), 92 Stat. 189, 189 (April 6, 1978). In view of the amendment, the plaintiff in *Betts* contended that *McCann*'s subterfuge analysis was no longer good law. The Court rejected that argument. The Court noted that Congress had not amended the statute by supplying its own definition of subterfuge or by modifying the subterfuge language; rather, it had simply added a clause forbidding mandatory retirement based on age. 492 U.S. at 168, 109 S. Ct. at 2862. The Court thus saw no reason to depart from *McCann*'s understanding of subterfuge. *Ibid.*

In section 623(j)(2), Congress has used virtually the same language that the Court construed in *Betts*. Indeed, Congress enacted the current version of section 623(j) in 1996, years after *Betts* was decided. Had Congress intended for courts to embark on a different course with respect to subterfuge, it could have made that clear in the statutory language. Accordingly, we see no signal from Congress that subterfuge should be handled differently for purposes of section 623(j)(2) than it was by the Supreme Court in *Betts* and subsequently by this court, following *Betts*' lead, in *Bell*. *See Knight*, 992 F.2d at 1546. We note that our sister circuits, in construing similar subterfuge language contained in the Americans with Disabilities Act, 42 U.S.C. § 12201(c), have likewise continued to look to *Betts* as the relevant precedent on subterfuge. *See E.E.O.C. v. Aramark*

*Corp.*, 208 F.3d 266, 269-70 (D.C. Cir. 2000); *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 103-06 (2d Cir. 1999); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 611 (3d Cir. 1998); *Krauel v. Iowa Methodist Medical Center*, 95 F.3d 674, 678-79 (8th Cir. 1996).

Among other things, *Betts* makes clear that the burden is on the plaintiffs to establish that the mandatory retirement of firefighters and police officers constitutes a subterfuge to evade the purposes of the ADEA. 492 U.S. at 181, 109 S. Ct. at 2868. The plaintiffs remind us that the OWBPA also overruled *Betts* in this regard, shifting the burden to the employer to prove that a benefit plan drawing distinctions based on age is not a subterfuge. *See* P.L. 101-433 § 103, 104 Stat. 978, 979; *e.g.*, *Erie County Retirees Ass'n v. County of Erie, Pa.*, 220 F.3d 193, 204-05 (3d Cir. 2000). Once again, however, the route that Congress chose to that end is significant. Congress added language to the exemption for benefit plans expressly allocating to the employer the burden of proof on subterfuge. *See* § 623(f)(2) ("[a]n employer . . . shall have the burden of proving that [its] actions [in observing the terms of a benefit plan] are lawful in any civil enforcement proceeding brought under this chapter"). By contrast, it omitted such language in 1996 when it reenacted section 623(j)(2), electing instead to use language virtually identical to that before the Supreme Court in *Betts*. The fact that Congress elected to use language that *Betts* had construed to impose the burden of proof on the plaintiff leaves no doubt in our minds that Congress meant to embrace that construction. *See Bragdon v. Abbott*, 524 U.S. 624, 645, 118 S. Ct. 2196, 2208 (1998); *Lorillard v. Pons*, 434 U.S. 575, 580-81, 98 S. Ct. 866, 870 (1978); *see also*, *e.g.*, *Leonard F.*, 199 F.3d at 104. Therefore, we must proceed to consider how the plaintiffs might carry their burden within the *Betts* framework for subterfuge.

We may resolve one point with dispatch. In the question that the district court certified, the court asked whether

there is any evidence with which a plaintiff might establish subterfuge for purposes of section 623(j)(2) if there is no violation of section 623(j)(1). If, for example, a public employer had in place age restrictions on the employment of public safety officers prior to March 3, 1983, as Chicago did, are there any circumstances under which the reinstatement or renewed enforcement of those age limits could possibly amount to a subterfuge to evade the purposes of the ADEA? The district court understood the City to be arguing that this question must be answered in the negative, foreclosing any inquiry into subterfuge. *Cf. Knight*, 992 F.2d at 1546-47 (because mandatory retirement age of 55 for Georgia state troopers was established in 1970, before ADEA was extended to cover state employees, the retirement age necessarily could not have been a subterfuge to evade the purposes of the ADEA); *see Drnek II*, 205 F. Supp. 2d at 897-98. To accept this argument as correct, the district court believed, would be to collapse the two prongs of section 623(j) and render subsection (j)(2), which contains the subterfuge language, a nullity. *Id.* at 898-99. We agree. Section 623(j) permits a state or local government to discharge a police officer and/or firefighter who has reached a mandatory retirement age so long as that retirement age was in place when *Wyoming* was decided or (if not) the plaintiff is at least 55 years old (prong 1) *and* the discharge is effectuated pursuant to a bona fide retirement plan that is not a subterfuge to evade the purposes of the ADEA (prong 2). Both subsections of the exemption must be given meaning to the extent possible. *See, e.g.*, *Ortloff v. United States*, 335 F.3d 652, 659 (7th Cir. 2003) (citing *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149 (1992)), *cert. denied*, 124 S. Ct. 1520 (2004). As set forth below, we believe there are circumstances in which the reinstatement of mandatory retirement might amount to a subterfuge for purposes of section 623(j)(2), even if such a program meets the requirements of section (j)(1).

Evidence that City officials had impure motives for rein-
stating a mandatory retirement age, however, will not by
itself support an inference of subterfuge. As *Betts* makes
plain, an employment plan "cannot be a subterfuge to evade
the ADEA's purpose of banning arbitrary age discrimina-
tion unless it discriminates in a manner forbidden by the
substantive provisions of the Act." 492 U.S. at 176, 109 S.
Ct. at 2866. The ADEA does not forbid Chicago from
making age-based retirement decisions as to its police and
firefighting personnel; it expressly allows state and local
governments to make such decisions so long as they act
within the parameters set forth in section 623(j)(1), which
Chicago did. The statute does not condition the validity
of such retirement programs on proof that the public
employer has adopted the program genuinely believing that
it is justified in the interest of public safety. Instead,
recognizing that there was not yet any national consensus
as to the relationship between age and one's fitness to serve
as a police officer or firefighter, Congress opted simply to
restore the status quo *ante*, permitting states and cities to
continue imposing age limits on these positions as they had
been able to do prior to the ADEA's extension to state and
municipal employers and *Wyoming*'s 1983 holding sustain-
ing that extension. *See Kopec*, 193 F.3d at 903-04.

Thus, proof that Chicago resumed mandatory retirement
for police and fire personnel based in whole or in part on
stereotypical thinking—that older individuals are not up to
the rigors of law enforcement or firefighting and should
make room for younger, "fresher" replacements—or for
reasons wholly unrelated to public safety, will not establish
subterfuge because it does not reveal a kind of discrimina-
tory conduct that the ADEA by its very terms forbids. The
Supreme Court in *Betts* concluded that age-based decisions
in disability retirement benefits were not vulnerable to
challenge as a subterfuge merely because there was no
proof that the age differentials were justified on a cost

basis. The statute, as it was written at that time, expressly allowed such decisions. 492 U.S. at 169-177, 109 S. Ct. at 2862-67. Likewise, we concluded in *Bell* that an age-based cutoff in the university's retirement contributions did not amount to a subterfuge even in the face of evidence that the university preferred a younger faculty. "[T]he defendants cannot be liable for their *motives* if their *conduct* has not evaded the ADEA's prohibitions," we said, 975 F.2d at 429 (emphasis supplied), and doing something that the statute expressly permits does not evade its prohibitions. *See Betts*, 492 U.S. at 176-77, 109 S. Ct. at 2866-67.

What is necessary to establish subterfuge is proof that the employer is using the exemption as a way to evade another substantive provision of the act. *Id.* at 181, 109 S. Ct. at 2868. Both of the hypotheticals that *Betts* used to illustrate this point envision the employer making an age-based distinction that is expressly permitted by the statute as a means of committing another kind of discrimination that the ADEA prohibits. Here then, a viable claim of subterfuge would require the plaintiffs to allege and prove that Chicago took advantage of the statutory authorization to mandatorily retire police officers and firefighters as a means of discriminating in another aspect of the employment relationship—that is, other than in the discharge decision—in a way that the statute forbids.

The district court was concerned that so limiting the means of establishing subterfuge would render the subterfuge provision of section 623(j)(2) almost meaningless. Because mandatory retirement, in contrast to a reduction in fringe benefits, effectively ends the employment relationship, the district court reasoned, it would be difficult if not impossible for a mandatorily retired police officer or firefighter ever to show that the employer used the retirement program as a means of committing some independent form of forbidden discrimination. *Drnek II*, 205 F. Supp. 2d at 898-99.

Yet, that is not the case. In fact, each of the two hypotheticals that the Supreme Court cited in *Betts* as examples of viable claims for subterfuge under the former version of section 623(f)(2) readily translates into the present context. First, as *Betts* makes clear and as the district court recognized, a plaintiff of course would have a claim for subterfuge if a city or state government exercised its right to reimpose age limits in order to retaliate against one or more employees for protesting practices made illegal by the ADEA. *Betts*, 492 U.S. at 180, 109 S. Ct. at 2868; *Drnek II*, 205 F. Supp. 2d at 899. Second, *Betts* suggested in the context of a fringe benefit plan that reducing the wages of all workers while substantially increasing the benefits provided to younger workers might constitute a subterfuge for wage discrimination against older workers. 492 U.S. at 180, 109 S. Ct. at 2868. One can imagine a variant of that hypothetical here: as the City suggests, if it were shown that a public employer had reinstated mandatory retirement for police and firefighting personnel pursuant to section 623(j) but, at the same time, created a new, lower-paying position not restricted by age and invited the mandatorily-retired officers to apply for that position, then it could be inferred that the employer was using its mandatory retirement program as a subterfuge for wage discrimination against older employees. These examples demonstrate that the subterfuge provision of section 623(j)(2) retains meaning when construed in a manner consistent with *Betts* and *Bell*. We therefore see no need to depart from the approach of those precedents.

We owe a plaintiff's complaint a generous construction in deciding whether it states a claim on which relief can be granted. *E.g.*, *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1001-02 (7th Cir. 2002). Here, the plaintiffs' complaints broadly allege that the MRO amounts to a subterfuge to evade the purposes of the ADEA. Unadorned, those allegations might state a viable ADEA claim if the

plaintiffs were prepared to establish subterfuge in one of the ways illustrated by *Betts*. However, as fleshed out in the briefing, the particular theory of subterfuge that the plaintiffs are pursuing is not viable. The plaintiffs suggest no way in which Chicago might have used its authority to reimpose mandatory retirement pursuant to section 623(j) as a subterfuge for forbidden discrimination in some other aspect of their employment relationship. Their sole contention is that in exercising the City's prerogative to reinstate mandatory retirement, certain City legislators and other officials were motivated by a desire to remove from the police and firefighting forces older workers whom they felt were not up to the job and/or to create openings for younger workers. Yet, the statutory exemption expressly permits the City to reinstate its mandatory retirement program, and the inevitable result of any such program will be to force older employees from the workforce and create openings for younger workers. That some City officials affirmatively wished for that result, perhaps because of unfortunate stereotypes about the abilities of older workers, is immaterial insofar as section 623(j)(2) is concerned. *Betts* and *Bell* require proof that the City was using mandatory retirement as a vehicle to commit some other type of age discrimination forbidden by the ADEA. And here the plaintiffs can postulate no type of discrimination other than the very type of age-based discrimination (mandatory retirement) that the statute permits.

## III.

Having answered the question certified for interlocutory review, we REMAND these cases to the district court with directions to DISMISS the plaintiffs' ADEA claims and to conduct such further proceedings as may be consistent with this opinion. We thank the parties and amicus American Association of Retired Persons for their helpful briefs.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*