# United States Court of Appeals
## For the First Circuit

No. 06-2578

CARMELO CORREA-RUIZ, FORMER COLONEL, ET AL.,

Plaintiffs, Appellants,

DANIEL GARCIA, ET AL.,

Movants,

v.

HONORABLE LUIS FORTUÑO, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF
PUERTO RICO, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Salvador E. Casellas, U.S. District Judge]

Before
Lipez and Howard, Circuit Judges,
and DiClerico,* District Judge.

Ariel Hernandez Santana, with whom Jesus Hernandez Sanchez and
Hernandez Sanchez Law Firm were on brief, for appellants.
Susana I. Peñagarícano-Brown, Assistant Solicitor General,
with whom Salvador J. Antonetti-Stutts, Solicitor General, Mariana
Negrón-Vargas, Deputy Solicitor General, and Maite D. Oronoz-
Rodríguez, Deputy Solicitor General, were on brief, for appellees.

July 7, 2009

*Of the District of New Hampshire, sitting by designation.

**LIPEZ**, **Circuit Judge**.    The Age Discrimination in Employment Act ("ADEA") contains an exemption provision that allows state and local governments to set mandatory retirement ages for law enforcement officers and firefighters.  See 29 U.S.C. § 623(j). In this case, we examine for the first time revised criteria for invoking that exemption, including a provision that conditions its use on the employer's compliance with fitness testing regulations that have yet to be promulgated by the Secretary of Health and Human Services.  Id.  Appellants are more than two dozen former Puerto Rico police officers who claim that their forced retirement at age fifty-five, pursuant to Puerto Rico Law 181, violated the ADEA and the Due Process Clause of the Fourteenth Amendment.  See P.R. Laws Ann. tit. 3, § 766g (2003) ("Law 181").  The officers filed suit against the Commonwealth of Puerto Rico, its police department, the current and former governors, and the current and former police superintendents, seeking declaratory and injunctive relief and damages.  The district court dismissed all claims,[1] concluding that Law 181, Puerto Rico's mandatory retirement law, is consistent with the ADEA and that appellants' terminations also

---

[1] Appellants also alleged a supplemental claim under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141. The district court dismissed the federal claims with prejudice and the Commonwealth claim without prejudice.  Given our disposition of the federal claims, we do not further consider the supplemental claim.  See Marrero-Gutierrez v. Molina, 491 F.3d 1, 7 (1st Cir. 2007) ("A district court retains the discretion . . . to decline to exercise supplemental jurisdiction where the district court has dismissed all claims over which it had original jurisdiction.").

conformed to constitutional requirements.  We agree and therefore affirm.

**I.**

**A. Applicable Age Discrimination Laws**

1.  The ADEA

As originally enacted in 1967, the ADEA did not apply to States and their political subdivisions.  EEOC v. Wyoming, 460 U.S. 226, 233 (1983).[2]  It thus had no impact on the age limits that many local governments had adopted for police and firefighting personnel.  See, e.g., Johnson v. Mayor and City Council of Baltimore, 472 U.S. 353, 358 (1985) (evaluating city code provision, adopted in 1962, requiring mandatory retirement of most firefighting personnel at age fifty-five); Minch v. City of Chicago, 363 F.3d 615, 618 (7th Cir. 2004) (noting Chicago's requirement, "[a]s early as 1939," that city firefighters retire at the age of sixty-three); Binker v. Pennsylvania, 977 F.2d 738, 742 n.2 (3d Cir. 1992) (discussing Pennsylvania law, first enacted in 1929, requiring state police officers to retire at age sixty). Among such provisions was Puerto Rico's Law 447, adopted in May 1951, which established a mandatory retirement age of sixty-five for both police officers and firefighters.

---

[2] A chronology of the Congressional action and Supreme Court cases leading up to the current ADEA exemption for the mandatory retirement of police officers and firefighters appears at the end of this opinion.

Congress extended the ADEA to cover government employers in 1974, and the Supreme Court quelled uncertainty over the constitutionality of that amendment nine years later in <u>EEOC</u> v. <u>Wyoming</u>, 460 U.S. at 243.[3]  Once the ADEA became applicable to their employees, States and localities could retain maximum hiring and retirement ages only if they could show that age was a bona fide occupational qualification for particular positions.  <u>See</u> 29 U.S.C. § 623(f)(1).[4]  This so-called "BFOQ exception" is "'extremely narrow,'" and eligibility may turn on whether the employer can demonstrate "'a factual basis for believing[] that all or substantially all persons over the age qualification[] would be unable to perform . . . the duties of the job involved.'"  <u>Gately</u>

---

[3] Doubt about whether the ADEA could be applied to state and local governments had arisen in the aftermath of the Supreme Court's decision in <u>National League of Cities</u> v. <u>Usery</u>, 426 U.S. 833 (1976).  <u>See</u> <u>Kopec</u> v. <u>City of Elmhurst</u>, 193 F.3d 894, 896-97 (7th Cir. 1999).  In <u>Usery</u>, which was subsequently overruled by <u>Garcia</u> v. <u>San Antonio Metro. Transit Auth.</u>, 469 U.S. 528 (1985), the Court held that the Tenth Amendment barred extension of the minimum-wage and overtime provisions of the Fair Labor Standards Act to state and local governments.  426 U.S. at 851.  Although <u>Wyoming</u> eliminated Tenth Amendment concerns about the ADEA, the Supreme Court later held that Congress did not have the authority to abrogate the States' sovereign immunity from suit by private individuals for monetary relief under the ADEA.  <u>See</u> <u>Kimel</u> v. <u>Florida Bd. of Regents</u>, 528 U.S. 62, 91 (2000).  Injunctive relief, however, remains available.  <u>State Police for Automatic Ret. Ass'n</u> v. <u>DiFava</u>, 317 F.3d 6, 12 (1st Cir. 2003).

[4] Section 623(f)(1) allows employers "to take any action otherwise prohibited under [the statute] . . . where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business . . . ."  29 U.S.C. § 623(f)(1).

-4-

v. <u>Massachusetts</u>, 2 F.3d 1221, 1225-26 (1st Cir. 1993) (quoting <u>W. Air Lines, Inc.</u> v. <u>Criswell</u>, 472 U.S. 400, 412, 414 (1985) (additional citation and emphasis omitted; some alteration in original)). Thus, with the 1974 amendment, States and localities were subject to the same restrictive standard as private employers for justifying the use of age in employment decisions.

In 1986, however, Congress again amended the ADEA to provide a limited exemption for the mandatory retirement of state and local law enforcement officers and firefighters. <u>See</u> 29 U.S.C. § 623(j) (1988). The exemption, known as the "safe-harbor" provision, permitted any state or local government that had in place age restrictions for law enforcement officers or firefighters on March 3, 1983 – the day after the decision in <u>EEOC</u> v. <u>Wyoming</u> – to reinstate those restrictions. The amendment did not allow adoption of new mandatory retirement provisions, and the exemption for pre-existing laws had a limited life span. "[D]esigned to provide states an opportunity to adjust to the Supreme Court's decision," <u>DiFava</u>, 317 F.3d at 9 n.3., the exemption expired on December 31, 1993, when mandatory retirement provisions adopted by state and local governments once again became subject to attack for age discrimination.

That reversion to past practice was short-lived. In 1996, Congress reinstated the safe-harbor provision, with some revisions and without a sunset provision, retroactive to its

-5-

December 31, 1993 termination date. See 29 U.S.C. § 623(j).

Significantly, the 1996 legislation broadened the exemption to allow States and localities that had not had age restrictions before the Wyoming decision to enact such limits. Under this renewed safe-harbor provision, a public employer may impose mandatory retirement on law enforcement officers and firefighters who either attain the age of retirement that was in place for those employees as of March 3, 1983, or – if the employer's age limit was enacted after the 1996 amendment took effect – the higher of the age contained in the post-1996 enactment or age fifty-five. Like the original version of the exemption, the 1996 amendment also provided that any exempted discharge be "pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of [the ADEA]." 29 U.S.C. § 623(j)(2).[5]

---

[5] The full text of section 623(j) is as follows:

(j) **Employment as firefighter or law enforcement officer**

It shall not be unlawful for an employer which is a State, a political subdivision of a State, an agency or instrumentality of a State or a political subdivision of a State, or an interstate agency to fail or refuse to hire or to discharge any individual because of such individual's age if such action is taken –

(1) with respect to the employment of an individual as a firefighter or as a law enforcement officer, the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained –

(A) the age of hiring or retirement,

-6-

The 1996 legislation also directed the Secretary of Health and Human Services ("HHS") to study and report to Congress within three years on the availability of tests or other methods for assessing the ability of law enforcement officers and firefighters to complete public safety tasks. Within four years, the Secretary was to issue advisory guidelines on the use and administration of physical and mental fitness tests to assess the competency of such personnel, and the guidelines were to be followed by regulations "identifying valid, nondiscriminatory job performance tests that shall be used by employers seeking the exemption." Pub. L. No. 104-208 § 119(2); 110 Stat. 3009, 3009-24-25 (1996). The legislation further provided that, once the regulations were issued, employers relying on the exemption would

---

respectively, in effect under applicable State or local law on March 3, 1983; or

(B) (i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after September 30, 1996; or

(ii) if applicable State or local law was enacted after September 30, 1996, and the individual was discharged, the higher of –

(I) the age of retirement in effect on the date of such discharge under such law; and

(II) age 55; and

(2) pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter.

be required to give public safety personnel who reached retirement age an annual opportunity to show fitness for duty by passing such a test. 110 Stat. 3009-25. Individuals who passed the test could not be forced to retire. Id.

The expectation that fitness tests would be developed and prescribed in regulations became part of the law as codified. The statute requires the employer to comply with "section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section." 29 U.S.C. § 623(j)(1). The reference to "section 3(d)(2)" has been understood to be a mistaken reference to section 2(d)(2) of Public Law 104-208, which requires employers to offer the fitness tests deemed appropriate by the Secretary. See Pub. L. No. 104-208 § 119(2)(d)(2), 110 Stat. 3009, 3009-25 (1996); § 623(j) Historical and Statutory Notes. Section 2(d)(2) provides that the requirement does not take effect, however, until "the date of issuance of the regulations" identifying such tests.[6]

_____

[6] Section 2(d) of Pub. L. No. 104-208, § 119, states:

(d) JOB PERFORMANCE TESTS-
(1) IDENTIFICATION OF TESTS.--After issuance of the advisory guidelines described in subsection (c), the Secretary shall issue regulations identifying valid, nondiscriminatory job performance tests that shall be used by employers seeking the exemption described in section 4(j) of the Age Discrimination in Employment Act of 1967 with respect to firefighters or law enforcement officers who have attained an age of retirement described in such section 4(j).
(2) USE OF TESTS.--Effective on the date of issuance of

Thus, § 623(j)(1) effectively states that the employer's obligation to administer fitness tests to individuals who reach mandatory retirement age begins on "the date of issuance of the regulations," which is the date described in section 2(d)(2) of the ADEA amendments. However, neither the advisory guidelines on the use and administration of tests, nor any regulations identifying appropriate tests, have yet been issued. On its face, then, the statute anticipates fitness testing as a prerequisite for mandatory retirement, but the tests required to be used have not yet been identified.[7]

2. Puerto Rico Law 181

In August 2003, the Puerto Rico legislature amended its longstanding mandatory retirement law for Commonwealth police officers and firefighters, Act No. 447 of May 15, 1951, under which

---

the regulations described in paragraph (1), any employer seeking such exemption with respect to a firefighter or law enforcement officer who has attained such age shall provide to each firefighter or law enforcement officer who has attained such age an annual opportunity to demonstrate physical and mental fitness by passing a test described in paragraph (1), in order to continue employment.

[7] The 1986 legislation also had ordered the Department of Labor and the Equal Employment Opportunity Commission ("EEOC") to conduct a study of the feasibility of fitness testing for public safety personnel and directed the EEOC to promulgate guidelines on the administration and use of such tests. Researchers from the Center for Applied Behavioral Sciences of The Pennsylvania State University conducted the study for the government entities and concluded that "age was a poor predictor of performance in public safety occupations," but no guidelines were issued. See H.R. Rep. 103-314 (Nov. 1, 1993).

age sixty-five had been the upper limit of their employment.  The new Government Personnel Retirement Act, Law 181, lowered the mandatory retirement age to fifty-five for police officers and firefighters with thirty years of service, although the superintendent of the police force could authorize an officer to serve up to an additional twenty-four months as a member of the Police Reserve force.  P.R. Laws Ann. tit. 3, § 766g (2003).

The preamble to Law 181 framed the retirement scheme as a way to promote modernization and innovation by bringing new officers into the public safety forces.  The preamble further stated that "no discrimination is being applied to the members of the Police or Firefighters Corps for reason of age."  Rather, the motivation was "to give a higher security to the people and to protect the security" of police officers and firefighters.

The mandatory retirement provision was again amended in 2005.  Under Act No. 22, police officers and firefighters with thirty years of service could take voluntary retirement at age fifty-five, but the mandatory retirement age was changed to fifty-eight.  P.R. Laws Ann. tit. 3, § 766g (2005).

## B. Procedural Background

Four days after Law 181 was enacted, the Superintendent of the Puerto Rico Police Department sent letters advising officers who had reached age fifty-five that they had thirty days to complete the necessary documents for their retirement.  More than

two dozen officers who were involuntarily terminated under Law 181 subsequently filed this action against the Commonwealth of Puerto Rico, its police department, Governor Sila M. Calderón-Serra ("Calderón"), Police Superintendent Agustin Cartagena-Diaz, and former Police Superintendent Victor M. Rivera-González,[8] alleging violations of the ADEA and, under 18 U.S.C. § 1983, the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution. They also alleged a supplemental claim under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141.

In their complaint, the plaintiffs claimed that former Governor Calderón and former Superintendent Rivera-González had agreed "to get rid . . . of a group of old timers" within the Police Department and replace them with younger officers. They requested declaratory and injunctive relief to invalidate and enjoin enforcement of Law 181 and to establish their right to due process before being terminated. They also sought compensatory and punitive damages against the individual defendants.

The defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that the Eleventh Amendment barred the claims against the Commonwealth, the Police Department, and the

---

[8] Luis Fortuño, the current governor, was later added to the case in his official capacity, and Calderón remained a defendant in her personal capacity. Jose Figueroa Sancha, the current superintendent of police, has been substituted for Cartagena as a defendant.

-11-

individual defendants in their official capacities. They further asserted that the plaintiffs had failed to state claims under the ADEA and section 1983, and they alternatively raised a qualified immunity defense.

In ruling on the motion, the district court noted plaintiffs' concession that the Eleventh Amendment barred monetary damages against the non-individual defendants and the individual defendants in their official capacity, and it accepted defendants' assertion, uncontested by plaintiffs, that there is no individual liability under the ADEA. Correa-Ruiz v. Calderón-Serra, 411 F. Supp. 2d 41, 47 (D.P.R. 2005). The court also found no merit in the substantive claims, including plaintiffs' contentions that Law 181 is a subterfuge to evade the ADEA and that the Commonwealth violated the ADEA by forcing plaintiffs' retirements without first administering a fitness test as contemplated by section 623(j). Id. at 48-52. The court dismissed all federal claims with prejudice and the supplemental claim under Commonwealth law without prejudice. Id. at 52-53. The court also denied plaintiffs' motion for reconsideration.

Plaintiffs appeal both the judgment of dismissal and the denial of reconsideration. They argue that the district court improperly dismissed their complaint based on its erroneous interpretation of the ADEA and its failure to apply well established principles of due process entitling them to a hearing

-12-

before they were terminated.[9]  They also claim that the Supreme Court's Eleventh Amendment jurisprudence does not foreclose the availability of damages from the Commonwealth under a due process theory.

Our review of the district court's grant of a motion to dismiss is novo.  Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008).  "To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).  We turn first to the ADEA claim and then briefly discuss the due process claim.  Our disposition of these claims makes it unnecessary to consider appellants' arguments concerning available remedies.

## II.

On appeal, plaintiffs offer numerous theories to support their contention that the defendants violated their rights under the ADEA.  Among these claims, we discern three rationales for recovery that warrant our attention: (1) plaintiffs' terminations in accordance with Law 181 were unlawful because the ADEA bars a state or local government from lowering a retirement age that was in effect as of March 3, 1983, (2) plaintiffs' mandatory retirement violated the ADEA because they were not provided with fitness

---

[9] Plaintiffs do not present an equal protection argument on appeal, and we therefore deem any such claim waived.  See Levin v. Dalva Brothers, Inc., 459 F.3d 68, 75 n.4 (1st Cir. 2006) (noting that claims not raised in opening appellate brief are waived).

testing to determine their capacity to continue working, and (3) plaintiffs' terminations did not comply with § 623(j)(2) of the ADEA because their discharges were not "pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter."

**A. The Lowered Retirement Age of Law 181 and the ADEA**

Plaintiffs maintain that the 1986 and 1996 amendments to the ADEA, which created the exemption for age-based termination of public safety personnel, prohibit the reduction of a mandatory retirement age that was applicable on March 3, 1983. They contend that § 623(j) permits enactment of new age limits only in States and localities that had no mandatory retirement law in effect at that time. Because Puerto Rico's mandatory retirement age for police officers was sixty-five in March 1983, plaintiffs assert that Law 181, with its lowered age limit, must be invalidated as inconsistent with the federal law.[10]

In construing a statute, we begin with its plain meaning, and "[i]f the meaning of the text is unambiguous our task ends there as well." United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008). A statute is not ambiguous unless "'it admits of more than one reasonable interpretation.'" Id. (quoting Gen. Motors Corp. v.

---

[10] This argument was not raised before the district court and therefore could be treated as waived. See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 533 F.3d 1, 6 (1st Cir. 2008). We have nevertheless chosen to address it in order to clarify the scope of the safe-harbor provision.

-14-

Darling's, 444 F.3d 98, 108 (1st Cir. 2006)). The language of § 623(j), as amended in 1996, does not support plaintiffs' proposed interpretation of the safe-harbor provision. The statute explicitly provides that States or their subdivisions may discharge a law enforcement officer or firefighter pursuant to a mandatory retirement plan that either was in effect on March 3, 1983 or was enacted after September 30, 1996. The only age-related limitation on the latter option is that the discharge occur no earlier than age fifty-five. 29 U.S.C. § 623(j)(1)(B)(ii). Nothing in the language of the provision even suggests that governments that had mandatory retirement laws in place as of March 3, 1983 could not enact new laws with lower retirement ages after September 30, 1996.

Plaintiffs rest their argument in part on an explanatory "Rule of Construction" contained in the background information that follows § 623(j) in the United States Code. The note, as it appeared in the 1996 legislation, states:

> CONSTRUCTION.--Nothing in the repeal, reenactment, and amendment made by subsections (a) and (b) shall be construed to make lawful the failure or refusal to hire, or the discharge of, an individual pursuant to a law that–
> (1) was enacted after March 3, 1983 and before the date of enactment of the Age Discrimination in Employment Amendments of 1996; and
> (2) lowered the age of hiring or retirement, respectively, for firefighters or law enforcement officers that was in effect under applicable State or local law on March 3, 1983.

-15-

Pub. L. No. 104-208 § 119(1), 110 Stat. 3009, 3009-24 (1996).

Plaintiffs argue that this note eliminates any ambiguity in the language of the ADEA amendments and shows that the Commonwealth was prohibited from lowering the mandatory retirement age for firefighters and law enforcement officers that was in effect as of March 3, 1983. By its terms, however, the note applies only to laws that were enacted between March 3, 1983 and "the date of enactment" of the 1996 ADEA amendments, which was September 30, 1996. Law 181 was enacted on August 15, 2003 – outside the time frame to which the note refers. Thus, rather than supporting plaintiffs' view that Law 181 violated the ADEA, this note is strong evidence to the contrary. If the prohibition were meant to extend to a law passed <u>after</u> the excluded period of time, the end date in the phrase would have been unnecessary. Thus, the only plausible interpretation of the note is that States and localities were permitted to enact laws lowering the mandatory retirement age for police officers and firefighters after passage of the 1996 amendment, so long as they complied with the requirements set out in the amendment.

Plaintiffs' reliance on our decision in <u>Gately</u>, 2 F.3d 1221, where we invalidated a lowered retirement age, is equally misplaced. The mandatory retirement law at issue there was enacted in 1991 in connection with the consolidation of four Massachusetts police forces. <u>Id.</u> at 1224. Before the consolidation, officers in

three of the forces had been subject to retirement at age sixty-five and officers serving on the fourth force had been subject to retirement at age fifty.  Id.  The 1991 state legislation imposed mandatory retirement at age fifty-five on all members of the consolidated force.  Id.  We held that the 1986 amendment to the ADEA did not permit Massachusetts to lower the retirement age to fifty-five for the group of officers who, in 1983, were subject to retirement at sixty-five.  Before adoption of the 1996 amendments, a mandatory retirement scheme enacted after March 3, 1983, imposing new or lowered age limits on employment, was permissible only if it qualified under the narrow BFOQ exception.  See id. at 1225-26 (describing the ADEA "'escape clause'" that allows all "employers some limited flexibility to take age into consideration in business decisions").

Unlike Gately, this case is not governed by the 1986 amendment and, as we have explained, a state statute lowering the retirement age for public safety personnel is permitted by the 1996 amendment so long as the amendment's other requirements are met.  See Feldman v. Nassau County, 434 F.3d 177, 182 (2d Cir. 2006) ("[T]he exception can absolve a state or local government of liability under the ADEA for an age limit in law enforcement hiring regardless of whether that age limit was in existence pursuant to local law at the time Wyoming was decided or whether it was enacted after the 1996 ADEA amendments that reinstated the law enforcement

-17-

exception.") (citations omitted).[11]  Law 181 is therefore not

invalid as a result of its lower triggering age.[12]

## B. The Fitness Testing Requirement

Plaintiffs contend that, even if they were lawfully

subject to retirement at age fifty-five, the Commonwealth had to

give them the opportunity to avoid discharge by taking performance

tests that could prove their physical and mental fitness to

continue working.  This is the testing described above, which

Congress expected to be in place within about four years after

enactment of the 1996 amendment.  Although plaintiffs acknowledge

that the particular tests referenced in the statute have never been

---

[11] Indeed, we observed in DiFava that the safe-harbor provision
"allows states, if they choose, to continue to enforce against
relevant law enforcement officers certain earlier age-based
retirement laws (or to create new laws consistent with the mandates
of the statute)." DiFava, 317 F.3d at 14 (emphasis added). DiFava
primarily concerned the Massachusetts statute we found invalid in
Gately in light of the 1986 amendments, but its present-tense
description of the law suggests an understanding of the then-
current version of section 623(j) consistent with the view we have
articulated here.

[12] Because the 1996 version of § 623(j) allows States and their
subdivisions to impose mandatory retirement at age fifty-five or
above, provisions adopting such a limit do not need to meet the
requirements contained in § 623(f)(1) for a BFOQ exception. See
Feldman, 434 F.3d at 182 n.5 (holding that § 623(j) "by its terms
relieves law enforcement agencies of having to establish that age
is a BFOQ in order to discriminate on the basis of age"); Kopec,
193 F.3d at 902 (noting that "[s]ection 623(j) would . . .
accomplish nothing if the exemption from the ADEA were conditioned
upon a BFOQ showing" because "[t]hat requirement is already found
in section 623(f)(1)"); see also Knight v. Georgia, 992 F.2d 1541,
1547 (11th Cir. 1993) (holding that, under the equivalent provision
in the 1986 amendment, a BFOQ showing was not necessary).

identified by the Secretary of HHS, they insist that testing is nonetheless a prerequisite to their discharge. They claim that, in the absence of federally developed tests, Puerto Rico was required to devise its own evaluation system – or refrain from imposing mandatory retirement.

We reject this reading of the statute. Although the language of § 623(j)(1) requires careful parsing, it unambiguously requires testing as a pre-condition to mandatory retirement only for those employees who would be discharged after the Secretary of HHS promulgates appropriate tests.[13] As described above, section (j)(1) states that the testing requirement applies "if the individual was discharged after the date described in such section," and "such section" is "section 3(d)(2) of the Age

---

[13] For convenience, we repeat the relevant portion of the provision:

It shall not be unlawful for an employer which is a State . . . to discharge any individual because of such individual's age if such action is taken –

(1) with respect to the employment of an individual as a firefighter or as a law enforcement officer, the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 <u>if the individual was discharged after the date described in such section</u> . . . .

623(j)(1) (emphasis added). The statute then goes on to list the permissible retirement ages depending on the time of enactment of the applicable mandatory retirement plan and, in subsection (2), requires that the plan be bona fide and not a subterfuge to evade unlawful discrimination.

-19-

Discrimination in Employment Amendments of 1996." 29 U.S.C. §
623(j)(1).[14] The date referenced in section (d)(2) is "the date of
issuance of the regulations" the Secretary "shall issue . . .
identifying valid, nondiscriminatory job performance tests that
shall be used by employers seeking the exemption." Pub. L. No.
104-208 § 119(2), 110 Stat. 3009-25 (1996). Thus, when pieced
together, the elements of the statutory requirement are that (1)
employers seeking the benefit of the safe-harbor provision (2) must
use the tests identified by the Secretary (3) once regulations
identifying those tests have been issued.

Although the statutory language is not in our view
reasonably susceptible to another interpretation, our conclusion
would be the same if we deemed the provision ambiguous and found it
necessary to consider legislative history to ascertain Congress's
intent. See Godin, 534 F.3d at 56 (noting that, "[i]f the statute
is ambiguous, we look beyond the text to the legislative history in
order to determine congressional intent"); see also Minch, 363 F.3d
at 620 n.4 (stating that "[t]he failure to promulgate guidelines
and regulations for fitness testing gives rise to an ambiguity in
the statute"); Drnek v. Chicago, 192 F. Supp. 2d 835, 840 (N.D.
Ill. 2002) (concluding that "the plain language of § 623 is

_____

[14] As explained earlier, the reference to section (3)(d)(2)
should have been to section 2(d)(2). See supra note 6 &
accompanying text.

-20-

ambiguous" because "it leaves a gap by requiring employers to comply with regulations that have not been promulgated").

In a thoughtful discussion that was endorsed by the Seventh Circuit in Minch, see 363 F.3d at 620 n.4, the district court in Drnek examined § 623(j)'s legislative history at length before concluding that the public safety exemption in the provision was "subject to the use of fitness tests when and if suitable tests were ever made available by HHS." Drnek, 192 F. Supp. 2d at 842. The court cited comments made during floor debates on the proposed legislation that showed skepticism among members of Congress about the adequacy of existing physical tests. See id. at 841-42.[15] The court then concluded:

> [T]he legislative history suggests that the intent of the amendment was to reinstate an

_____

[15] For example, Representative Owens "noted that fitness tests in existence at that time tended to discriminate against women and minorities, and that they were not an effective substitute for age limits." Drnek, 192 F. Supp. 2d at 841 (citing 141 Cong. Rec. 9491, 9492). Representative Weldon also observed that "'[f]itness tests are not a valid alternative to age limits,' apparently because of the shortcomings of existing tests, and that '[i]n the absence of a valid fitness test, age limits ensure our public safety teams are in peak condition.'" Id. (quoting 141 Cong. Rec. at 9492). Senator Moseley-Braun spoke directly to the issue of States and localities devising substitute tests:

> "[Y]ou may ask why State and local governments cannot just develop tests to screen out those individuals who may still retain their strength at the age of 60 or 70. However, there is no adequate test that can simulate the conditions that firefighters and police officers face in the line of duty."

Id. (quoting 141 Cong. Record 7765, 7766).

-21-

> exemption from the ADEA allowing for age-based
> retirement for public safety officials because
> fitness tests were unreliable, expensive, and
> had potential discriminatory effects on women
> and minorities.  The provision in § 623(j)(1)
> for compliance with § 3(d)(2) merely imposed
> an obligation on employers to provide tests
> when and if suitable tests became available;
> it did not make tests a condition precedent to
> the operation of the exemption.

Id. at 842.

We thus agree with the Seventh Circuit that "this component of section 623(j)(1) is essentially meaningless at this juncture." Minch, 363 F.3d at 620 n.4.  At present, a State or local government seeking to enforce a mandatory retirement provision must show only that: (1) the designated retirement age was set forth in a law that either was (a) in effect on March 3, 1983, or (b) in a law enacted after September 30, 1996, and is no lower than age fifty-five; and (2) the termination was taken pursuant to a bona fide retirement plan that is not a subterfuge for impermissible age discrimination.  Having already addressed the timing and scope of Law 181, we now consider appellants' contention that the statute was a subterfuge to evade the purposes of the ADEA.[16]

---

[16] Plaintiffs have failed to put in issue the bona fide nature of the retirement plan.  In their Eighth Amended Complaint, they alleged that the defendants did not act pursuant to a bona fide retirement plan, but, as the district court noted, "[t]hat lone assertion" is insufficient to state a viable ADEA claim.  See Correa-Ruiz, 411 F. Supp. 2d at 50.  Nor is it sufficient to preserve the issue for appeal.  See B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 40 (1st Cir. 2004) ("To

-22-

## C. The Subterfuge Requirement

Plaintiffs argue that the enactment of Law 181 was a subterfuge to evade the requirements of the ADEA because the defendants "discriminated in a manner forbidden by the Act" when they lowered the mandatory retirement age from sixty-five to fifty-five. Plaintiffs emphasize that defendants acted with discriminatory animus, deliberately seeking to replace them with younger officers, and they assert that this discriminatory motive connotes an impermissible scheme to bypass defendants' obligations under the ADEA.

In effect, plaintiffs allege that Law 181 was a subterfuge to evade the ADEA because it was the product of intentional age discrimination. Using age as a basis for requiring retirement is precisely what section 623(j)(2) entitles the Commonwealth to do, however, and we thus join the Second and Seventh Circuits in rejecting an interpretation of "subterfuge" that would effectively nullify the exemption. See Feldman, 434

---

preserve a point for appeal, some developed argumentation must be put forward in the nisi prius court – and a veiled reference to a legal theory is not enough to satisfy this requirement."). Indeed, appellants have not attempted to develop the allegation on appeal.

An ADEA claim resting on that basis would, in any event, be unlikely to succeed in this case. See Kopec, 193 F.3d at 901 ("Imbuing 'bona fide' with the meaning it carries in other, comparable provisions of the statute, a bona fide hiring plan presumably would be one that is genuine and pursuant to which actual hiring decisions are made." (citing Pub. Employees Ret. Sys. v. Betts, 492 U.S. 158, 166 (1989), for the proposition that an "employee benefit plan is 'bona fide' to the extent that it . . . exists and pays benefits . . . . (citation omitted))).

F.3d at 184 ("There is nothing deceptive about the state legislature doing exactly what Congress provided it the authority to do . . ."); Minch, 363 F.3d at 629 ("[D]oing something that the statute expressly permits does not evade its prohibitions.").

In its analysis of the subterfuge limitation in Minch, the Seventh Circuit relied on the Supreme Court's decision in Public Employees Retirement System v. Betts, 492 U.S. 158 (1989). Minch, 363 F.3d at 623-29; see also Feldman, 434 F.3d at 184 (adopting the reasoning in Minch). The Court in Betts had considered another provision of the ADEA – section 623(f)(2) – that also contained a "subterfuge" exception to an exemption from liability. Minch, 363 F.3d at 624. Section 623(f)(2) protected age-based employment decisions from the prohibitions of the ADEA if they were taken pursuant to the terms of a bona fide benefit plan and if – in the same language that appears in section 623(j) – the plan was "not a subterfuge to evade the purposes of" the Act. Id.

In interpreting the "not a subterfuge" language in section 623(f), the Supreme Court rejected the notion that age-based differences in employee benefits would be inconsistent with the ADEA unless the employer could offer a cost justification for the differential treatment. Betts, 492 U.S. at 170-72. The Court concluded that, to avoid "a self-defeating interpretation" of the exception, id. at 178, the "not a subterfuge" criterion could not invalidate the very age-based line-drawing that the exemption

-24-

allowed.  Id. at 177-80; see also Minch, 363 F.3d at 625.  The Seventh Circuit applied that reasoning in the context of section 623(j):

> The ADEA does not forbid [a State or locality] from making age-based retirement decisions as to its police and firefighting personnel; it expressly allows state and local governments to make such decisions so long as they act within the parameters set forth in section 623(j)(1) . . . .  The statute does not condition the validity of such retirement programs on proof that the public employer has adopted the program genuinely believing that it is justified in the interest of public safety.  Instead, recognizing that there was not yet any national consensus as to the relationship between age and one's fitness to serve as a police officer or firefighter, Congress opted simply to restore the status quo ante, permitting states and cities to continue imposing age limits on these positions as they had been able to do prior to the ADEA's extension to state and municipal employers and Wyoming's 1983 holding sustaining that extension.

Minch, 363 F.3d at 629.  Thus, proof that an employer imposes mandatory retirement for police officers and firefighters based on the view that "older individuals are not up to the rigors of law enforcement or firefighting and should make room for younger, 'fresher' replacements . . . will not establish subterfuge because it does not reveal a kind of discriminatory conduct that the ADEA by its very terms forbids."  Id.

As both the Supreme Court in Betts and the Seventh Circuit in Minch emphasized, this understanding does not strip the "subterfuge" provision of all meaning.  Instead, a plaintiff

-25-

asserting subterfuge must show that "the employer is using the exemption as a way to evade another substantive provision of the act" – in other words, that the employer is "commit[ting] some other type of age discrimination forbidden by the ADEA."  Minch, 363 F.3d at 629-30; see also Betts, 492 U.S. at 180; Feldman, 434 F.3d at 184.  The Seventh Circuit offered two examples of viable claims of subterfuge in the context of section 623(j): (1) if an employer adopted or reinstated age limits in order to retaliate against an employee who had protested practices made unlawful by the ADEA,[17] or (2) if the employer adopted age limits for police and firefighting personnel at the same time that it created a new, lower-paying position unrestricted by age, and invited the newly retired officers to apply, allowing the inference that the mandatory retirement scheme was a subterfuge for wage discrimination against older employees.  Minch, 363 F.3d at 630 (citing Betts, 492 U.S. at 180).

As we have described, the plaintiffs here offer only accusations of age-based animus to support their subterfuge contention, alleging in their complaint that the governor and police superintendent agreed to "get rid . . . of a group of old

---

[17] Section 4(d) of the ADEA, codified at 29 U.S.C. § 623(d), forbids discrimination against an employee who has "opposed any practice made unlawful by" the Act or has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" of an age discrimination complaint.

timers with the purpose of replacing them by younger officers." Even if that allegation fairly describes the defendants' motivation, the fact remains that the ADEA permits government employers who are concerned about the effectiveness of older public safety officers to impose mandatory retirement at age fifty-five. Plaintiffs have thus offered no theory of subterfuge that can withstand a motion to dismiss, and they have therefore failed to state a viable claim under the ADEA.

**III.**

Plaintiffs assert that their Fourteenth Amendment right to due process was violated when, pursuant to Law 181, the defendants lowered the mandatory retirement age by ten years without providing them an opportunity to demonstrate their physical and mental fitness to continue working. They claim that Law 447, the 1951 act that set sixty-five as the upper age limit for police officers, gave them a property interest in their jobs until they reached that age. Plaintiffs also assert that they were entitled to individual hearings before their terminations.

We see no merit in this constitutional claim. To the extent plaintiffs have a property interest in their jobs, it derives from Commonwealth law. See Hatfield-Bermúdez v. Aldanondo-Rivera, 496 F.3d 51, 59 (1st Cir. 2007) ("Property interests are 'created and . . . defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd.

-27-

of Regents v. Roth, 408 U.S. 564, 577 (1972))).  The "right" to continued employment until age sixty-five that plaintiffs claim to have been given by Law 447 was modified by Law 181, and no due process violation occurs when "the legislature which creates a statutory entitlement (or other property interest) . . . alter[s] or terminat[es] the entitlement by subsequent legislative enactment." Gattis v. Gravett, 806 F.2d 778, 780 (8th Cir. 1986); see also id. at 781 ("While the legislative alteration or elimination of a previously conferred property interest may be a 'deprivation,' the legislative process itself provides citizens with all of the 'process' they are 'due.'" (citing Atkins v. Parker, 472 U.S. 115, 131 (1985)); Story v. Green, 978 F.2d 60, 63 (2d Cir. 1992) ("Having enacted a statute that created such a [property] right, . . . the legislature retains the power to enact new legislation altering or eliminating the right, and that elimination does not contravene the Due Process or Takings Clauses of the Constitution."); Hoffman v. City of Warwick, 909 F.2d 608, 619-20 (1st Cir. 1990) ("Where the legislature enacts general legislation eliminating statutory rights or otherwise adjusting the benefits and burdens of economic life, in the absence of any substantive constitutional infirmity, 'the legislative determination provides all the process that is due.'" (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982)); see also Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry., 470

U.S. 451, 465-66 (1985) ("[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" (quoting Dodge v. Bd. of Educ., 302 U.S. 74, 79 (1937))); Nat'l Educ. Ass'n-Rhode Island ex rel. Scigulinsky v. Retirement Bd. of R.I., 172 F.3d 22, 27 (1st Cir. 1999).

Moreover, "[w]hen statutory benefits are denied or terminated pursuant to a class-wide policy determination, as opposed to an individual determination of eligibility, the Due Process Clause does not require the state to afford a hearing to each affected individual." Hoffman, 909 F.2d at 620; see also Johnson v. Lefkowitz, 566 F.2d 866, 869 (2d Cir. 1977) (rejecting entitlement to hearing before mandatory retirement because "the administrative cost to the state of providing each retiree with a hearing would be enormous, and by far outweigh the hardship to the individual"); cf. O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 800 (1980) (Blackmun, J., concurring in the judgment) ("When governmental action affects more than a few individuals, concerns beyond economy, efficiency, and expedition tip the balance against finding that due process attaches."). Thus, the Police Department's failure to administer fitness tests before discharging

plaintiffs violates neither the Constitution nor, as we have explained, the ADEA.

Plaintiffs also attempt to rest a due process claim on the "arbitrariness" of age fifty-five as "the point at which Police Officers are no longer physically fit to serve on the force." They cite the Puerto Rico legislature's subsequent amendment of Law 181, by Act No. 22 of June 30, 2005, raising the upper age limit for police officers and firefighters to fifty-eight, as evidence that the defendants lacked a basis for terminating their employment at age fifty-five. Although this claim is insufficiently developed to warrant our consideration, it is, in any event, patently unavailing. Section 623(j) explicitly permits States to impose mandatory retirement on public safety personnel at age fifty-five, and a state legislature is therefore not obliged to amass scientific research or empirical evidence justifying its decision to adopt that age. The judgment made by Puerto Rico's legislature, after further reflection, that the Commonwealth's safety goals could be better achieved by raising the age to fifty-eight hardly demonstrates that the prior adoption of age fifty-five was arbitrary. "Forceful arguments certainly can be made as to the wisdom of enforcing a maximum age of hire," Kopec, 193 F.3d at 904, but Puerto Rico's decision to do so consistently with the ADEA did not violate plaintiffs' right to due process.

**IV.**

We summarize our holdings:

(1) Puerto Rico's Law 181, which lowered the mandatory retirement age for public safety personnel from sixty-five to fifty-five, is consistent with section 623(j) of the ADEA;

(2) Defendants were not required to administer fitness tests before enforcing Law 181's mandatory retirement age because the testing requirement in section 623(j) will not take effect until appropriate tests are identified in regulations promulgated by the Secretary of HHS;

(3) Plaintiffs' allegations of age-based animus on the part of defendants do not establish that Law 181 was a "subterfuge" for unlawful discrimination within the meaning of section 623(j)(2) because the exemption's purpose is to allow the termination of police officers and firefighters on the basis on age;

(4) The Due Process Clause of the Fourteenth Amendment was not violated by plaintiffs' terminations without fitness testing or individualized hearings.

We thus conclude that the district court properly dismissed plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a viable claim for relief. The court likewise properly denied plaintiffs' motion for reconsideration.

The judgment of the district court is therefore affirmed.

-31-

So ordered.

CHRONOLOGY OF EVENTS LEADING TO AN EXEMPTION UNDER
THE ADEA FOR THE MANDATORY RETIREMENT OF
FIREFIGHTERS AND LAW ENFORCEMENT OFFICERS

**1967**
ADEA enacted.  It does not apply to states and their political subdivisions, and existing mandatory retirement provisions for police officers and firefighters are unaffected.

**1974**
Congress extends the ADEA to cover government employers, meaning that public employers could retain maximum hiring and retirement provisions only if they could show that age was a bona fide occupational qualification for the jobs.

**1976**
U.S. Supreme Court decision in National League of Cities v. Usery, 426 U.S. 833 (1976), raises doubts about whether the ADEA could constitutionally be applied to state and local governments.

**1983**
U.S. Supreme Court decision in EEOC v. Wyoming, 460 U.S. 226 (1983), upholds the extension of the ADEA to government employers. Mandatory retirement ages for firefighters and police officers were once again clearly unlawful unless the states and localities could show that age was a bona fide occupational qualification.

**1986**
Congress amends the ADEA to provide a temporary "safe-harbor" provision allowing the mandatory retirement of state and local law enforcement officers and firefighters if the government employer had an age restriction in place on March 3, 1983 – the day after the ruling in EEOC v. Wyoming.  No new mandatory retirement provisions could be adopted, and the exemption expired on December 31, 1993.

**1996**
Congress reinstated the safe-harbor provision, retroactive to December 31, 1993.  The 1996 amendment also allowed public employers to adopt new mandatory retirement laws. Public employers could thus impose mandatory retirement on police officers and firefighters if: (1) the employer had a mandatory retirement law in effect as of March 3, 1983, and the age of retirement was set no lower than the age set in that earlier law; or (2) the employer enacted a new mandatory retirement provision with an age limit no lower than fifty-five.